UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,                   **REPORT AND**
                                                                     **RECOMMENDATION**
    -against-
                                                                     CV 06-4217 (NGG) (ARL)
ONE WALL STREET, INC., et al.,

                              Defendants,

    -and-

LA SHONDRA HATTER,

                              Relief Defendant.
-------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

      Following the entry of a default judgment against defendants One Wall Street, Inc. ("One Wall Street"), Donte C. Jarvis ("Jarvis"), Willis "Bill" White, III ("White"), Cecile Baptise (aka John Latorri) ("Baptiste/Latorri"), and relief defendant La Shondra Hatter ("Hatter") (collectively, the "non-settling defendants"), the Honorable Nicholas G. Garaufis referred this matter to the undersigned by for a report and recommendation as to the amount to be disgorged from each of the non-settling defendants together with prejudgment interest as well as whether civil penalties should be imposed, and if so, in what amounts. For the reasons set forth below, the undersigned recommends the following: (1) One Wall Street and Jarvis should be jointly and severally liable for disgorgement of $1,925,620; (2) White should be jointly and severally liable with One Wall Street and Jarvis for disgorgement of $1,000; (3) Baptise/Latorri should be jointly and severally liable with One Wall Street and Jarvis for disgorgement of $198,619.80; and (4) Hatter should be jointly and severally liable with One Wall Street and Jarvis for disgorgement of

$166,570.80. The undersigned also recommends that each of the non-settling defendants is liable for prejudgment interest in an amount that shall be re-calculated and submitted by the plaintiff. In addition, the undersigned recommends that a Third Tier civil money penalty be imposed against each of the non-settling defendants other than Hatter in the following amounts: One Wall Street in the amount of $1,925,620; Jarvis in the amount of $1,925,620; White in the amount of $30,000; and Baptiste/Latorri in the amount of $198,619.08.

## BACKGROUND

On October 24, 2007 Judge Garaufis entered default judgments against each of the non-settling defendants and referred to the undersigned the Commission's motion for disgorgement, prejudgment interest and civil penalties.[1] A default constitutes an admission of all well-pleaded factual allegations in the complaint, except those relating to damages. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir.), cert. denied, 506 U.S. 1080 (1993). The complaint describes that during the years 2003 through 2006, the defendants engaged in a fraudulent scheme to sell One Wall Street securities by means of false and fraudulent representations. (Compl. ¶ 16). The scheme, which targeted senior citizens, raised approximately $1.6 million dollars that was then distributed to the defendants in varying amounts. (Compl. ¶¶ 15-16). The non-settling defendants collectively induced approximately

---

[1]The court notes that Judge Garaufis entered a Partial Judgment of Permanent Injunction and Other Relief by Consent against defendant Alan Brown on May 22, 2007 and referred the SEC's claims for disgorgement, prejudgment interest and a civil penalty to the undersigned for a report and recommendation. Adopting the undersigned's report, Judge Garaufis entered an order on January 3, 2008 holding Brown liable for disgorgement in the amount of $95,965, together with prejudgment interest thereon in the amount of $12,107.18, and a civil penalty in the amount of $60,000 pursuant to Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 771(d), and Section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3).

thirty-one investors to purchase One Wall Street stock on the basis of false representations. (Compl. ¶ 17).

One Wall Street offered to sell investors and potential investors subscriptions to an investment advice newsletter/e-mail bulletin service as well as shares of One Wall Street common stock. One Wall Street also represented that it would provide investors with annual reports containing audited consolidated financial statements. (Compl. ¶¶ 22(ii)). Contrary to this representation, such annual reports were never provided. (Compl. ¶ 28).

Defendant Jarvis, the Chief Executive Officer, Chief Operating Officer, President, Secretary and Chief Analyst of One Wall Street, described himself to investors as the "principal analysis [sic], market technician and editor of all product communications" for One Wall Street. (Compl. ¶¶ 10, 21-23). To induce individuals to purchase One Wall Street stock, One Wall Street distributed a two private placement memoranda, dated June 1, 2003 and October 1, 2004, to investors and potential investors that each falsely stated that One Wall Street was making a $5 million offering, and that the proceeds from this offering would be used in a specific manner: $500,000 for legal fees and other expenses associated with the offering, $1 million for marketing, $1.5 million to acquire distressed financial research companies, $1.5 to expand into international markets, and $500,000 to expand One Wall Street's IT infrastructure. (Compl. ¶¶ 21-22). Instead, the proceeds of the offering were deposited into One Wall Street's checking account at North Fork Bank for which Jarvis was the sole signatory. (Compl. ¶ 26). Jarvis then used these funds primarily for his personal living expenses and otherwise for his own benefit and for the benefit of his wife, relief defendant Hatter. (Id.). One Wall Street did not expend any of the investors' funds on company acquisition or expansion as was represented in the private

placement memorandum. (Compl. ¶ 27). Jarvis obtained at least $153,000 of the investors' funds deposited in the One Wall Street checking account through ATM withdrawals and an additional $695,000 via cash withdrawals, checks payable to cash, and the purchase of cashier's checks.[2] (Compl. ¶ 26). In addition, at least $205,000 was spent by Jarvis via debit card purchases for goods and services for his personal use. (Compl. ¶ 26). Jarvis also applied at least $180,000 from the One Wall Street checking account to his personal direct bill payments. (Compl. ¶ 26). Checks totaling $420,000 to third parties other than Jarvis and Hatter were also drawn from One Wall Street's checking account. (Compl. ¶ 26). For example, the complaint describes that Jarvis made approximately $55,000 in payments to mortgage lenders; $53,000 in payments for automobile loans; $21,000 in payments for restaurant and entertainment bills; and $3,300 in payments towards his child day care expenses. (Compl. ¶ 27). Thus, a substantial portion of these checks appear on their face to be unrelated to One Wall Street's business and instead were used for Jarvis' personal use. (Compl. ¶ 27).

Defendant White managed One Wall Street's office and directly solicited at least nine investors. (Compl. ¶¶ 11, 20). The complaint and investor declarations submitted by the Commission describe, by way of example, six specific instances where White induced investors ranging in age from 41 to 88 to purchase One Wall Street stock totaling at least $100,000. (Compl. ¶ 20(i)-(iii)); Decl. of Investor JE; Decl. of Investor PB; Decl. of Investor MA; Libal

---

[2] The complaint alleges that Jarvis obtained an additional $150,000 via a cashier's check written to his wife, relief defendant Hatter.

Decl. ¶ 27(d) & (e)).[3] White induced the investments by falsely representing that an IPO was imminent which would substantially increase the value of the stock and/or that One Wall Street would soon be acquired by E*Trade or another large, unidentified company, and as a consequence the value of One Wall Street shares would significantly increase. (Id.) White's oral representations to investors were false and misleading because One Wall Street is not a publically traded company, E*Trade has not engaged in any business discussions with One Wall Street, nor was there any basis for White's predictions that the value of One Wall Street stock would reach certain price points in the future. (Compl. ¶ 25; Libal Decl. ¶¶ 24-25). The One Wall Street bank account records reflect that White received at least $2,400 directly from One Wall Street.

Defendant Baptiste/Latorri was a salesperson for One Wall Street who directly solicited at least seventeen investors to purchase One Wall Street stock through a series of false and misleading oral representations. (Compl. ¶¶ 13, 17; Libal Decl. ¶ 27). The complaint and investor declarations submitted by the Commission describe, by way of example, six specific instances where Baptiste/Latorri induced investors ranging in age from 58 to 78 to purchase One Wall Street stock totaling at least $240,750 by falsely representing that an IPO was imminent which would substantially increase the value of the stock. (Decl. of Investor GC; Decl. of Investor RL; Decl. of Investor RC; Decl. of Investor EB; Libal Decl. ¶ 27(a), (b) & (g)). The One Wall Street bank account records reflect that Baptiste/Latorri received at least $198,619.08 directly from One Wall Street.

---

[3]"Libal Decl." refers to the Declaration of Dawn Libal, dated August 11, 2006. Ms. Libal is a staff member of the Broker-Dealer Inspection Program of the United States Securities and Exchange Commission.

Relief defendant Hatter, who is defendant Jarvis's wife, received a net payment of at least $166,570.80 from One Wall Street, although none of One Wall Street's records reflect that Hatter performed any legitimate services for One Wall Street or that she was otherwise entitled to receive these funds. (Compl. ¶ 14; Hendelman Decl. ¶ 29).[4]

Plaintiff seeks a judgment against: (1) defendants One Wall Street and Jarvis holding each jointly and severally liable for disgorgement in the amount of $1,925,620; (2) defendant White holding him jointly and severally liable with defendants One Wall Street and Jarvis for disgorgement in the amount of $2,400; (3) defendant Baptiste/Latorri holding him jointly and severally liable with defendants One Wall Street and Jarvis for disgorgement in the amount of $198,619.08; and (4) defendant Hatter holding her jointly and severally liable with defendants One Wall Street and Jarvis for disgorgement in the amount of $166,570.80. The plaintiff also seeks an award of prejudgment interest on each of these awards as well as the imposition of the maximum civil penalty for each of the defendants other than Hatter for their violation of the federal securities law. None of the defendants have opposed the plaintiff's motion.

## DISCUSSION

    A.    Disgorgement

In cases involving securities law violations, a "district court has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996) (citing SEC v. Lorin, 76 F.3d 458, 461-62 (2d Cir. 1996) (per curiam); SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995); SEC v.

---

[4] "Hendleman Decl." refers to the Declaration of Neil Hendelman in Support of Claims for Disgorgement and Civil Penalties. Mr. Hendelman is a Staff Accountant in the SEC's Division of Enforcement.

6

Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972)). It is well-established in the Second Circuit that "the primary purpose of disgorgement is to deter future fraud by depriving violators of their ill-gotten gains." SEC v. Jones, 476 F. Supp. 2d 374, (S.D.N.Y. 2007) (citing SEC v. Cavanagh, 445 F.3d 105 (2d Cir. 2006); SEC v. Fischbach Corp., 133 F.3d 170 (2d Cir. 1997) (add'l citations omitted)); see also Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d. Cir. 1978) ("[T]he primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched."); SEC v. Wang, 944 F.2d 80, 81 (2d Cir. 1991) ("[T]he primary purpose of the equitable remedy of disgorgement in these circumstances is to ensure that those guilty of securities fraud do not profit from their ill-gotten gains."). Thus, "disgorgement need only be a reasonable approximation of profits causally connected to the violation . . . [and] any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created the uncertainty." SEC v. Patel, 61 F.3d at 139-40. "The amount of disgorgement, as an equitable remedy, is determined by the amount of profit realized by the defendant." SEC v. Absoultefuture.com, 393 F.3d 94, 96 (2d Cir. 2004) (per curium). While the SEC bears the burden of proving that its disgorgement figure approximates the amount of unjust enrichment, once that burden is met it falls to the defendant to demonstrate that this demand is somehow unreasonable or that he actually received less than the than the amount sought to be disgorged. SEC v. Inorganic Recycling Corp., Civ. 99-10159(GEL), 2002 WL 1968641, *2 (S.D.N.Y Aug. 23, 2002). With these standards in mind, the court addresses each defendant below.

      i)      One Wall Street and Jarvis

Plaintiff asserts that defendants One Wall Street and Jarvis should be ordered to disgorge

7

$1,925,620, representing the net amount of monies sent by investors to One Wall Street for the purpose of purchasing One Wall Street common stock. In support of this assertion, plaintiff has provided a summary of the bank account records of One Wall Street, which reflects that between December 2002 and June 2006, One Wall Street received 130 checks from investors for the purpose of purchasing One Wall Street stock in the total sum of $1,687,650. (See Hendelman Decl. and Ex. 1 annexed thereto). Plaintiff has confirmed that these checks were written by investors for the purpose of purchasing One Wall Street common stock based upon review of investor declarations, interviews conducted with investors, notations that appeared on the investors' checks, and the amounts of the checks. (Hendelman Decl. ¶¶ 9-10). One Wall Street received an additional 26 checks in the total sum of $237,970 that are believed to be from investors for the purchase of One Wall Street common stock. The basis for this belief is that the amount of each check is substantially more than the amount that was received by One Wall Street for its investment advice services. (Hendelman Decl. ¶ 12). Neither defendant has contested the SEC's calculations.

Upon review of the plaintiff's submissions, it is clear that Jarvis and One Wall Street received 130 checks from investors for the purpose of purchasing One Wall Street stock in the total sum of $1,687,650. With regard to the additional 26 checks totaling $237,970, the SEC has met its burden of proving that such funds are from investors for the purchase of One Wall Street common stock. The defendants have failed to dispel any uncertainty as to the source of these funds. Accordingly, the court finds that the One Wall Street and Jarvis should be disgorged of their ill-gotten gains in the sum of $1,925,620.

Turning to the question of whether One Wall Street and Jarvis should be jointly and

severally liable for this amount, it is well-established that "the court has discretion to find joint and several liability when two or more defendants have collaborated in the illegal conduct . . . ." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007) (citing SEC v. Cavanagh, No. 98 Civ. 1818(DLC), 2004 WL 1594818, at *29 (S.D.N.Y. July 16, 2004); see also SEC v. AbsoluteFuture.com, 393 F.3d at 97 (joint and several liability is warranted "for combined profits on collaborating or closely related parties" so long as the total disgorgement amount does not exceed the defendants' combined profits). Given that Jarvis served as One Wall Street's Chief Executive Officer, Chief Operating Officer, President, Secretary and Chief Analyst, together with his significant role in the fraudulent scheme conducted through One Wall Street, the undersigned recommends that Jarvis and One Wall Street be held jointly and severally liable for the disgorged sum.

      ii)     White

With regard to defendant White, plaintiff asserts that he should be ordered to disgorge $2,400 representing the net amount of monies that either he or his relatives received directly from One Wall Street. Plaintiff asserts that four checks were drawn from One Wall Street's North Fork account that were payable to White or his relatives: (1) two checks payable to Joy J. White in the total sum of $800; (2) a check payable to Earnest White for $600; and (3) a check payable to defendant White for $1,000. (Hendelman Decl. ¶ 19-20). As there are no allegations of any wrongdoing on the part of either Joy J. White or Ernest White, the undersigned declines to recommend disgorgement from these sources. Rather, the undersigned finds that defendant White should be disgorged of $1,000 representing the ill-gotten gains paid to him by One Wall Street. Although the Commission has not proffered evidence that White received substantial

9

payments from One Wall Street, the documents submitted to the court make clear that White was an active participant in One Wall Street's fraudulent scheme. White solicited at least eight investors and sold One Wall Street stock to at least five investors for a total sum of $97,000. (Libal Decl. ¶¶ 27, 27(d), 27(e); JE Decl. ¶ 4; PB Decl. ¶ 4; and MA Decl. ¶ 3). In addition, the undersigned recommends that White be held jointly and severally liable with One Wall Street and Jarvis for the $1,000 disgorgement order.

        iii)        Baptiste/Latorri

Plaintiff contends that 77 checks totaling $198,619.08 from One Wall Street's North Fork account were made payable to defendant Baptiste/Latorri for the services he rendered in connection with One Wall Street's solicitation of investors. (Handelman Decl. ¶¶ 24-25). Accordingly, the plaintiff seeks to disgorge ill-gotten gains of $198,619.08 from Baptiste/Latorri. The documents submitted by the SEC clearly establish that Baptiste/Latorri was substantially involved in One Wall Street's sale of securities. Baptiste/Latorri solicited at least seventeen investors and sold One Wall Street stock to at least nine investors for a total of $366,750. (Libal Decl. ¶¶ 27, 27(a)-(b), 27(f)-(i); GC Decl. ¶¶ 4,7 and documents annexed thereto; RL Decl. ¶¶ 5, 8, 11 and documents annexed thereto; RC Decl. ¶ 4 and documents annexed thereto; EB Decl. ¶¶ 5-6 and documents annexed thereto). Because the documents submitted to the court demonstrate that Baptiste/Latorri's played a significant role in the fraudulent scheme, and that he received ill-gotten gains of $198,619.08 from One Wall Street, the undersigned recommends disgorgement of such funds and that he be held jointly and severally liable with Jarvis and One Wall Street for such disgorgement.

iv) Hatter

Plaintiff contends that 11 checks totaling $168,050 from One Wall Street's North Fork account were made payable to Hatter. (Handelman Decl. ¶ 28). The bank records reviewed by Handelman also reflect that Hatter wrote a check payable to One Wall Street in the amount of $1,479.20. (Id.). Deducting this sum from the total of the checks made payable to Hatter, she received a net payment of $166,570.80 from One Wall Street. (Id. ¶ 29). According to plaintiff, because One Wall Street's records do not reflect that Hatter performed any legitimate services for One Wall Street or that she was otherwise entitled to receive these funds, plaintiff seeks to disgorge ill-gotten gains of $166,570.80 from Hatter. Hatter has not contested this amount nor has she otherwise challenged the SEC's claim. Accordingly, the undersigned finds that Hatter should be ordered to disgorge ill-gotten gains of $166,570.80 and that she should be held jointly and severally liable for this amount with her husband, Jarvis and One Wall Street.

B. Prejudgment Interest

The SEC also seeks prejudgment interest on the disgorged funds. As with disgorgement, an award of prejudgment interest and the rate to be applied, if such interest is awarded, lies within the sound discretion of the court. First Jersey Sec., Inc., 101 F.3d at 1476. "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Roor, No. 99 Civ. 3372 (HB), 2004 WL 1933578, *10 (S.D.N.Y. August 30, 2004) (quoting SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)). According to the Second Circuit, the court's discretion should be guided by the following factors: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial

purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." First Jersey Sec., Inc., 101 F.3d at 1476 (citing cases). The Second Circuit further instructs that "the remedial purpose of the statute takes on special importance" in an enforcement action brought by a regulatory agency as in the case at bar. Id. In calculating prejudgment interest on funds disgorged in connection with securities law violations, courts have approved the use of the Internal Revenue Service's "underpayment rate," which is a floating rate used by the IRS to determine interest due on underpaid taxes. Id. at 1476-77 (citing cases). The IRS rates are not punitive, but rather are set at a level to prevent unjust enrichment. See 26 U.S.C. § 6621(a)(2); SEC Rules & Regulations, 60 Fed. Reg. 32738, 32788 (June 23, 1995). An award of prejudgment interest is appropriate for the "entire period from the time of defendants' unlawful gains to the entry of judgment." First Jersey Sec., Inc., 101 F.3d at 1477.

Applying these standards, the undersigned finds that an award of prejudgment interest is warranted. To find otherwise would unjustly enrich the defendants. Thus, the undersigned recommends that prejudgment interest be awarded on each of the disgorged sums at the IRS underpayment rate through the date the final judgment is entered.

Plaintiff has submitted detailed exhibits calculating the interest accrued based upon the pertinent IRS underpayment rates through November 31, 2007. (See Hendelman Decl. Exs. 3-7). Having reviewed these submissions, the undersigned finds that the plaintiff must recalculate the interest owed based upon the amounts of disgorgement through the actual date of judgment. The undersigned therefore respectfully recommends, should this report and recommendation be adopted, that the plaintiff be ordered to submit new calculations of the interest owed. This new calculation should reflect the current amount of prejudgment interest, plus a per diem amount

through the entry of judgment, based upon the above recommended amounts of disgorged gains.

   C.  Civil Penalty

  Finally, in addition to disgorgement, the court may impose civil penalties upon violators of the anti-fraud provisions of the federal securities laws. 15 U.S.C. § 77t(d), 78u(d)(3). Civil penalties are designed to deter securities fraud violations and extract a price beyond the ill-gotten profits that are disgorged. <u>SEC v. Coates</u>, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y. 2001) (citing H.H. Representation. No. 101-616 (1990)). The statutes provide for three levels or "tiers" of penalties. Under the first tier, the court may impose a penalty of up to the greater of either (1) $6,500 for an individual or $60,000 for a corporation, or (2) the gross amount of pecuniary gain to such defendant as a result of the violation. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). A second tier penalty is warranted for violations that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and may not "exceed the greater of (i) $60,000 for a natural person or $300,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).

  Here, the SEC seeks a third-tier penalty against defendants One Wall Street, Jarvis, White and Baptiste/Latorri. A third-tier penalty may not exceed the "greater of (i) $120,000 for a natural person or $600,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation" and is warranted if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). While the

13

plaintiff does not request a specific sum for each defendant, it urges that the court, in its discretion, impose an appropriate third-tier penalty because each of the defendants' violation of the securities law involved fraud creating a substantial loss to each of the investors they targeted.

In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. See SEC v. Opulentica, LLC, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) (citing Coates, 137 F. Supp. 2d at 428-29 (listing factors)); see also SEC v. Cavanagh, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004), aff'd on different grounds, 445 F.3d 105 (2d Cir. 2006) (citing SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (collecting cases)). While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a "discretionary nature" and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed." SEC v. Moran, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996). With these standards in mind, the court considers each defendant below.

(A)     One Wall Street

The complaint together with declarations and documentary evidence submitted in support of plaintiff's motion make clear that One Wall Street sold its unregistered common stock to investors in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77j(b), and Rule 10(b)(5), 17 C.F.R. § 240.10b-10b-5. These sales were accomplished through

14

misrepresentations made to investors by One Wall Street employees, namely White, Brown and Baptiste. The scheme in this case targeted multiple investors, many of whom are senior citizens with presumably less of an ability to recover from their losses. One Wall Street thus was nothing more than a conduit to simply steal the investors' funds. There is no basis for the court to conclude that any of the nearly $2 million investors' funds collected by One Wall Street was used for any legitimate purpose. Rather, Jarvis, the principle of One Wall Street, funneled such funds to himself, Hatter, and the other defendants. Upon consideration of the factors, the court finds that a third-tier penalty is clearly warranted against One Wall Street.

A review of the relevant case law indicates that the amount of the regulatory penalty assessed should have some relationship to the amount of ill-gotten gains. See, e.g., Opulentica, 479 F. Supp. 2d at 332; SEC v. Save the World Air, Inc., CV 01-11586(GBD), 2005 WL 3077514, at *20 (S.D.N.Y. Nov. 15, 2005); SEC v. Inorganic Recycling Corp., CV 99-10159(GEL), 2002 WL 1968341, at *3-4 (S.D.N.Y Aug. 23, 2002). Here, the record establishes that One Wall Street received ill-gotten gains of $1,925,620 from investors. Accordingly, the undersigned recommends that the penalty be equal to such an amount.

(B) Jarvis

With regard to Jarvis, in light of the seriousness of the fraud, his key role, and the extent of benefits that he directly received from his violation of the securities law, the court finds that a third-tier penalty is warranted and that the maximum fine is appropriate. Accordingly, the undersigned recommends that a civil penalty be imposed equal to the amount of his ill-gotten gains, namely $1,925,620.

(C) White

As noted earlier, the records submitted by the SEC reflect that White received only $1,000 directly from One Wall Street. Although the amount supported by the records is negligible, it is clear that White was an active participant in One Wall Street's fraudulent scheme in that he solicited at least eight investors and sold One Wall Street stock to at least five investors for a total sum of $97,000. However, because the amount of White's monetary gain in proportion to the total amount defrauded indicates that he was not a substantial beneficiary of the scheme, the court recommends that a third-tier civil penalty be assessed against White in the sum of $30,000.

(D) Baptiste/Latorri

Finally, with regard to Baptiste/Latorri, the documents submitted by the SEC clearly establish that Baptiste/Latorri was substantially involved in One Wall Street's fraudulent sale of securities in that he solicited at least seventeen investors and sold One Wall Street stock to at least nine investors for a total of $366,750. (Libal Decl. ¶¶ 27, 27(a)-(b), 27(f)-(i); GC Decl. ¶¶ 4,7 and documents annexed thereto; RL Decl. ¶¶ 5, 8, 11 and documents annexed thereto; RC Decl. ¶ 4 and documents annexed thereto; EB Decl. ¶¶ 5-6 and documents annexed thereto). Accordingly, the undersigned finds that a third-tier penalty is warranted and recommends that a civil penalty be imposed equal to the amount of his ill-gotten gains, namely $198,619.08.

## OBJECTIONS

A copy of the Report and Recommendation is being sent to the plaintiff. The plaintiff is directed to serve the defendants with a copy by certified mail, return receipt requested, and to file proof of service with the court. Any objections to this Report and Recommendation must be

filed with the Clerk of the Court with a courtesy copy to the undersigned within 10 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. See 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; Beverly v. Walker, 118 F.3d 900, 902 (2d Cir. 1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:  Central Islip, New York
        September 4, 2008

_____/s/_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge